HOUSTON LIGHTING & POWER CO. OF 1905 v. BARNES.

(Court of Civil Appeals of Texas. El Paso. Dec. 5, 1912. Rehearing Denied Jan. 15, 1913.)

1. MASTER AND SERVANT (§ 276*) — SAFE PLACE TO WORK — EVIDENCE OF CAUSAL CONNECTION.

Evidence, in an action for the death of plaintiff's intestate from a fall due to a shock from negligently insulated electric wires at a power plant where he was working as fireman, *held* sufficient, though circumstantial only, to show causal connection between the defendant employer's negligence and decedent's death.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. § 276.*]

2. NEGLIGENCE (§ 134*)—PROOF REQUIRED.

In a negligence case, direct connection between the negligence and injury must be shown, and there can be no recovery where it is equally consistent to infer that the injury was produced by some other cause as by defendant's negligence, but plaintiff's evidence need not exclude all mere possibilities of other causes if the reasonable deduction from the evidence is that defendant's negligence was the producing cause.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 267–273; Dec. Dig. § 134.*]

Appeal from District Court, Harris County; Charles E. Ashe, Judge.

Action by Mary A. Barnes against the Houston Lighting & Power Company of 1905. From a judgment for plaintiff, defendant appeals. Affirmed.

Blake Dupree, of Houston, for appellant. S. H. Brashear, John Lovejoy, and Presley K. Ewing, all of Houston, for appellee.

HIGGINS, J. This was a suit by appellee against the appellant for damages arising out of the death of her son, Percy Barnes, an employé of appellant's, whose death is alleged to have been caused by its negligence. Verdict and judgment was rendered in favor of appellee for $4,000, from which this appeal is prosecuted.

[1] The only question raised by the appeal is the sufficiency of the evidence to connect the death of Barnes with the negligence of defendant. Plaintiff in her petition alleged: "That the defendant, Houston Lighting & Power Company of 1905, is and was at the times of the occurrences of the matters and things hereinafter alleged engaged in Houston, Harris county, Tex., in the business of furnishing light and power by electricity, and for this purpose maintained and conducted an electric plant or works at said place. That on, to wit, the 11th day of March, 1908, Percy Barnes, a son of the plaintiff, was an employé of said defendant company as a fireman at its said plant, working in connection with its boiler room, but in no way connected with its electrical fixtures or machinery, and had only been working in said employment for a few weeks. That on the date aforesaid the said Percy Barnes was required, in the course of his duty in said employment, to proceed to the roof of said plant or works and thence to look over the top of a tank, situated on a projection above said roof, to ascertain the quantity of water in said tank. That in performing this duty, and without any negligence on his part, and while he was in the exercise of all due care, and relying on the defendant company to perform its duty to use ordinary care to furnish him a reasonably safe place in which to perform his duties, he (the said Percy Barnes) came in contact with, and was shocked and burned by, a certain electric wire which was stretched across said roof, and was also caused by said shock and burn to fall violently onto and against said roof and other objects appurtenant or near thereto, and as a result thereof (that is, of the shocking, burning, and falling) he (the said Percy Barnes) died within a short space of time thereafter. That the death of said Percy Barnes was caused proximately by the negligence and carelessness of said defendant company, its agents and servants, in this: That there were several of said wires stretched across said roof and a short distance above the same, to wit, within from three to six feet above the same, each of them carrying a heavy electric current. That said wires were insulated on the surface thereof, except in places, but that at some places such insulation had been removed or

had never been attached, or properly attached; and as a result the dangerous parts of said wires were exposed and liable to cause injury or death to any person coming in contact with the same. That the braiding by which said wires were originally, and at the time aforesaid, insulated was entirely too thin and light, considering the high and heavy current of electricity which regularly, and especially at said time, passed through said wires. That said defendant company had negligently and carelessly failed to use reasonable or ordinary care to inspect and repair or replace the said wires so as to obviate such defective conditions, or to install wires with full or sufficient braiding in the first instance, or that were properly insulated. That the said company's agents and representatives well knew the fact that said Percy Barnes and other employés of said company were required several times each day to perform the duty which he was performing at the time he came in contact with said wire as aforesaid, and well knew the fact that they would probably come in contact with said wire and wires, and that, if the same were not fully and properly insulated and so kept and maintained, they would cause serious bodily harm or death to such employés; but said company, its agents and representatives, in violation of its and their obligation and duty to use ordinary care to provide the said Percy Barnes a reasonably safe place to perform his work, failed to use ordinary care to discover such defective conditions and repair same, or replace such wires with sufficient ones, or to provide wires which were fully or properly braided or insulated in the first instance."

On March 7, 1908, Percy Barnes was employed by the defendant company as fireman, on duty from 4 o'clock in the afternoon until 12 o'clock at night. At the time G. W. Brooks was engineer in charge of the running of the plant, with the deceased and two other men under him. There was a tower on the roof of defendant's plant about 10 feet high; on this tower was a water tank, and it was the duty of the deceased to watch the level of the water in this tank, and to inspect same he had to ascend a ladder leading from the roof to the top of the tower; alongside the top of the ladder were wires leading out of the tower from the defendant's power plant to the city, heavily charged with electricity, they being the wires which carried the current out from the plant for distribution over the city of Houston, and the testimony discloses that defendant company was negligent in having failed to properly insulate these wires. In ascending the ladder and stepping onto the tower for the purpose of inspecting the water in the tank, deceased had to pass through a space of about 30 inches between the ladder and these defectively insulated wires. Shortly after 9 o'clock Brooks missed the deceased and he instructed the switchboard-man, Simmons, to make search for him, and in a short time Simmons came back and reported seeing a man lying on the roof. Brooks thereupon ascended the roof and found Barnes lying on his right side, frothing at the mouth and nose, and about six feet from the ladder leading to the tower. Barnes died shortly after he was discovered and without having regained consciousness. There was a slight cut or abrasion upon the temple or forehead of the deceased, and the proof disclosed that his skull was crushed at this point. The deceased was a man six feet high, weighing about 170 pounds, strong, in good health, and 26 years of age. After his death Barnes was removed to an undertaker's establishment, where his body was embalmed and prepared for interment, and the next morning was taken to the home of his mother.

J. E. Carson testified that he noticed the hands of deceased were drawn in a halfclosed condition and appeared dark on the inside. Plaintiff testified that there was an abrasion on his temple, and that his hands were perfectly black, like they had black oil on them inside. Hattie A. Wilson testified that the hands were drawn and black, and a little place in his temple as if he had been hit with something.

Morris Rosenthal testified: "I looked at his body. The only mark I saw on him was a little scratch on the side of his face about the temple, looked like it was scratched there; just showed a little scratch, just red, looked like it had been punctured a little there. You could see the blood from it. I could not tell what it was from, whether from an electric shock, bruise, hit, or what. I looked at his hands. He had been dressed when I saw him, been washed and dressed there, and I looked at him, and picked his hands up. His hands were all black inside, right rough in there and black inside; I don't know whether from his work or what, but black inside. His hands were laying this way."

It was shown that at the time Barnes was killed the electric current was passing through the wires on top of the building. Carson, Mrs. Barnes, Hattie A. Wilson, and Rosenthal did not see the body until the next morning, 12 hours after his death, and after the same had been embalmed and prepared for interment.

Dr. J. M. Boyles, witness for appellant, testified: "I am a practicing physician in the city of Houston for nearly 30 years. I remember being called to see a man named Percy Barnes at the electric light plant in this city. * * * I think that was about two years ago, in March, as near as I can remember; I don't remember the exact date. With reference to what I saw and the condition he was in when I was there, * * * I suppose I got the call about 10:30 at night. * * * I ordered a carriage, and about the time I dressed the carriage was there, and

I. had them drive rapidly, and I found the man. He was dead; died just a few minutes before I arrived. He was on the top of the roof of a house, roof of the building of the power house. * * * His feet were out forward laying on the beams, and blood was running out of his nose and ears. His skull was crushed just on his forehead, a little to one side of it, crushed in, good big crushed place on the skull. He had just died; he was warm. I stayed there until the undertaker came, and I examined him, and that is the only mark that could be found about him, only bruised place was his forehead. There were no burns about him. There was not a mark of any kind, description, on his hands, feet, or head. He was dead when I got there, * * * and I found then his head was crushed, skull fractured. Didn't make an examination after he left the plant. I made an examination at the plant, on the roof. I certainly did not make any other examination of him then, simply looked at him. We took his clothes off and examined him very carefully, and the reason I will explain that, it was in this way: There was no mark of violence about the man at all, no burn from the way he had fallen. It was a mystery to me how that man's skull was crushed. I could not understand it from the fact I could not see how he could fall on that floor, a shell roof, and break his skull. He could break his neck. It was the only time I was on the roof, but I presume it was only 10 or 12 feet high. * * * I could not see how he could crush his skull coming in contact with a shell roof, and I made a careful examination even of his hands and his feet and body to see if there was any burns. The burn could almost eliminate itself unless it could come in contact with a shock from the contact of one of those wires would have killed him, I would think, instantly, if he had come in contact with the wire, because they were large cables. I only made one examination; that was a careful examination; and, whether I made any other examination except to strip him and look over his body, made a careful examination, that is the only examination I made. I do not know of any other way by which I can examine a human body, a person who has been killed by electric current, in order to ascertain whether or not electricity has hit him simply by looking at him. If there is any other way known to science, I do not know it; I have never heard of it. I do not know that it is a fact that an electric current might enter a human being, kill him, and not leave any mark on him. With my experience with electricity, it never has done it. I know the man has always been burned. I have examined other persons in my life who were killed by electricity. I examined a man here that was killed by electricity. * * * I think that was the only one I ever examined, and it made marks on him.

* * * I have never seen a current enter a human body and kill a person and leave no marks. I did examine Barnes' skull particularly. * * * I saw his skull was fractured; it indicated his head had hit against something, or something had hit his head. * * * He had fallen on something solid, or something solid had hit his head. * * * I did not say a while ago it appeared to me he was hit by an electric current. * * * I said it had the appearance of some one having hit him. I said I examined for that to see if he had been burned when I first called; now, then, I find his skull fractured. I did write a letter to Mr. Chapman, the manager of the lighting company. I reported the case to him, because they had sent me there as a physician. I wrote him a report of the case, and I sent it in to him. It was done next morning, or a day or two, I don't remember just when. I generally report the case right away. Perhaps I did say in that letter, 'Fearing that he had come in contact with some live wire, I made a careful search for a burn.' That was the very first impression I had, that he had come in contact with a live wire. It was just natural that I had the first impression that he came in contact with a live wire, being in the condition he was right there among those cables, and for that reason as soon as I went in, before I discovered the fracture on his skull, I began to look to see if he came in contact with them, and I examined carefully and found his skull fractured. I don't say that a man could come in contact with a current and knock him down if he was up there and leave no trace at all of the electric current. I do not know what effect a current of electricity passing through the human body has upon the hands with respect to contracting the muscles. It frequently does contract them. * * * The effect does leave the muscles contracted that way so when the electricity is on and holds them; not if they are dead, after they are dead, I don't know, because I never had that experience. As to what effect an electric current has upon the palms of the hands where it has killed a person, after the corpse has lain for several hours, with reference to changing the color of the palm of the hands, I would not think it would change them at all; I do not know. I never saw it tried. I never heard of it changing them. If a man got an electric current through him that killed him and that current went through his hands, it would not have any effect upon the bottom of that hand after death, with respect to changing its color, unless it was there before his death. It would not have any, because there is nothing to change it; if it is going to change it, it would change it during his lifetime. The burn would be there and show for itself, and, if he died, it would be there still after his death. It it burned it suffi-

cient to discolor it, it would be there before death and be there after death. I examined the palm of his hands, all over him. I remember examining them. I don't think I washed his hands; I don't know whether we washed them or not, but I know we examined them very thoroughly. * * * If I had washed the man's hands I wouldn't surely recollect that, but I know there was not a scratch or burn or anything about him. Being a fireman, handling coal, lignite, whatever it was, his hands would naturally be black; if they were, we washed them, because we examined them. I can't tell positively whether we washed his hands. I did not wash the bottom of his feet. * * * We took his shoes and stockings off and looked at his legs to see, and I recollect I did not wash the bottom of his feet. I don't recollect whether we washed the bottom of his hands. We took him to an undertakers, and he was washed down there. * * * I know I examined those hands and the man thoroughly, and, had it been necessary to remove the dirt from them to discover whether they were burned or not, I would have done it. I do not say I did not; his hands might not have been dirty enough. As far as I know of my own knowledge, I never heard of a current of electricity going through a human body and killing him and him receiving no marks. From my experience as a physician and my knowledge of electricity, electric wounds, or injuries, there was nothing to indicate that the deceased had externally come in contact with the wires of the company that night."

Dr. J. G. Boyd, a witness for plaintiff, testified: "I am a practicing physician in this city, and I have been so for a good many years. I know something about electricity as an agency. I know what effect, something about what different effects it has upon the human body, when a current of electricity enters it, naturally I do. If a current of electricity passes through a person, and as a result of that death ensues, and I find the hands drawn, contracted, and the fingers drawn and contracted, and the palms of them black, discolored, that might be one of the effects of an electrical current going through a human body. An electrical current of sufficient force and voltage might pass through the human system and kill them and leave no mark whatever; such things can occur. The conditions under which it would be most likely to occur would be where a man has his clothing on, and his clothing was damp, and the connection was made through the clothing; in that case there would not necessarily be any mark left whatever. If the connection is made direct with the skin, it would leave marks. I say a man whose clothes are wet, if the electric current reaches his body through his clothes, that before it touches his skin, it would kill him without leaving any mark." On cross-examination he testified: "A man with his hands in this condition, drawn, and his fingers, and I found him dead or in an unconscious condition, that does not indicate, because he is near where electricity is, that he was killed by it, only in the event the palms of his hands were drawn and burned, I mean burned; if it was not burned, the mere fact of his hands being drawn, there was no indication, not without the burning. If the hands come in contact, there would necessarily be some mark; if they were discolored, that would indicate they were burned. They are darkened; they would be darkened and be hardened. They would not of necessity be burned clear through, but be darkened. As to whether it would show any indication or the meat being burned at all, I think, if the skin was cut through, it would be found changed. The skin would not have to be cut through to burn him, and there would not be any break necessarily. It would not leave a blister, necessarily, simply hardened, charred, without a break in it, in the appearance."

No issue is raised as to the sufficiency of the testimony to establish the negligence of appellant in the particular alleged in the petition, and the sole contention upon the part of appellant is that the facts detailed show no causal connection between such negligence and the accident resulting in Percy Barnes' death. There being no eyewitness to the circumstances attending the death of Barnes, and no direct and positive evidence connecting his death with the defective insulation of appellant's wires, it is competent to do so by the surrounding facts and circumstances.

[2] We recognize fully the correctness of the contention that a direct connection between the negligence and the injury must be shown, and where the injury may have been caused by the negligence of the defendant, but it is equally consistent to infer that it was produced by some other cause, the judgment cannot be sustained. In such case it is purely a question of surmise and conjecture as to which was the producing cause of death, and the proof fails to comply with the rule which imposes upon the plaintiff the burden of proving that the injury and death resulted from the negligence of the defendant. In the case at bar, however, we think, after a consideration of the testimony, it is sufficient to connect the cause of death with defendant's negligence. Dr. Boyd's testimony discloses that one of the effects of the passage of an electrical current through the human body is drawn, contracted, blackened, and discolored hands; that if the hands were blackened and discolored it indicated burning, and burning indicated contact with an electric current; that it would not necessarily make any break or blister, but would simply have a hardened, charred appearance. It is true the witness Dr. Boyles states that

there were no burns anywhere upon the body of the deceased, or anything to indicate contact with an electric wire, but the testimony of the other witnesses as to the condition and appearance of the hands raised an issue as to that fact. The fact that Barnes was found upon the roof of the building in a dying condition, and about six feet from the foot of the ladder leading to the top of the tower, with his hands in the condition shown by the testimony of the witnesses quoted, is sufficient to support the conclusion that in ascending the ladder his hands in some manner came in contact with the electric wires leading into the tower at the top of the ladder, resulting in a shock, which in itself was sufficient to produce death, or to precipitate him to the roof below, fracturing his skull, and that the shock or the fall, or both concurring, produced death.

Appellant argues that the evidence does not exclude the possibility that the injury received by the deceased did not occur or was not caused from what is commonly known as a fit, a sympton of which is frothing at the mouth, or from heart failure, or that he may have been precipitated to the roof from a misstep while climbing the ladder in performing his duties; and this is quite true, but it was not incumbent upon plaintiff to exclude all such possibilities. The testimony is not of that character where a theory of injury resulting from fit, heart-failure, misstep, or some other cause independent of any negligence upon the part of appellant is equally consistent with the conclusion that death resulted from deceased coming in contact with the defectively insulated wires; upon the contrary, under the testimony the reasonable deduction and conclusion to be drawn therefrom is that the defective wires were the producing cause of death.

We have carefully examined the cases cited by appellant. The cases of Railway Co. v. Porter, 73 Tex. 304, 11 S. W. 324, Railway Co. v. Riordan, 22 S. W. 519, and Railway Co. v. Nicholson, 22 S. W. 770, are not regarded as bearing upon the question of, causal connection at all, but relate rather to the question of a presumption of due care by the deceased and of negligence on the part of defendant. In the case at bar no question is raised as to any presumption of due care on the part of deceased, nor of any presumption of negligence on the part of defendant. The negligence of the defendant in the particulars alleged is amply shown by the testimony, and the only question involved is that of causal connection between this negligence and the death of the deceased.

The cases of Railway Co. v. Greenwood, 40 Tex. Civ. App. 252, 89 S. W. 810, English v. Railway Co., 44 Tex. Civ. App. 467, 98 S. W. 913, and Byerly v. C. L. P. & I. Co., 130 Mo. App. 593, 109 S. W. 1065, bear upon the question here considered, but are not regarded as authority in support of the contention that the judgment in the case at bar is unsupported by the testimony. In the Greenwood Case negligence on the part of defendant was shown, but there was absolutely no testimony to connect the injury with the negligence, and it was held it would be speculation of the purest type to hold that one, two, or all of the negligent matters caused the accident. In the case at bar we think the connection between the injury and the defectively insulated wires shown by the testimony of Dr. Boyd and of the various witnesses relating to the condition of the hands of the deceased and of the proximity of the body when found to these wires, thus removing the case entirely from the realm of conjecture and surmise. In the English Case it was contended it should be inferred that a certain apron had worked itself into the condition of a spring and thrown the deceased from the train, because it was shown that under certain conditions the apron did become a spring; but the court held that, under the facts disclosed by the testimony, the conditions did not exist which could have made the apron an instrument of danger. The Byerly Case more nearly supports the contention of appellant than any other, but the scope and extent of the Byerly Case is clearly shown by an opinion by the same court in Werner v. Metropolitan, etc., Co., 138 Mo. App. 1, 119 S. W. 1076, wherein it is said: "It is argued by defendant that the evidence fails entirely to show that plaintiff received an electric shock, and, in finding that he did, the jury necessarily was compelled to resort to conjecture. The recent case of Byerly v. Electric Co., 130 Mo. App. 593, 109 S. W. 1065, is relied on to sustain this contention. We found the inference from the facts and circumstances adduced in that case that Byerly's death was due to another cause than an electric shock was as reasonable as an inference that he received such shock, and therefore that the plaintiff had failed to show a direct causal connection between the negligence averred and the injury; but the facts and circumstances in the case now before us easily and vitally differentiate it from the Byerly Case. The scream of pain, followed immediately by unconsciousness, the subsequent manifestations of the effects of intense nervous shock, the close proximity of plaintiff to a powerful current of electricity, and the two instrumentalities by which that current could readily be diverted to his body, coupled with an entire absence of any other cause for the powerful stroke inflicted upon him, support a reasonable inference, based entirely on facts and circumstances in proof, and not in part on speculation, that the stroke was from an electric current of high potentiality."

The judgment is affirmed.